**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CARLOS R. GARCIA, | : | CIVIL CASE |
|     Plaintiff, | : | |
|            v. | : | |
| | : | |
| LANCASTER COUNTY PRISON, et al., | : | |
|     Defendants. | : | NO. 13-2018 |

**MEMORANDUM RE: MOTION TO DISMISS**

**Baylson, J.**                                                                                          **January 15, 2014**

## I.    Introduction

Plaintiff, Carlos R. Garcia, a state prison inmate, filed a Complaint with attached Exhibits on April 23, 2013 alleging § 1983 claims under the Eighth and Fourteenth Amendments.  ECF 3 (Complaint).  On the same day, this Court entered an Order:

- granting Plaintiff's Motion to Proceed In Forma Pauperis;

- dismissing Plaintiff, Robert Medina, as a party to the action, because he failed to sign the Complaint and to either (a) pay the filing fee or (b) file a motion to proceed in forma pauperis;

- dismissing all claims seeking release from imprisonment or vacatur of sentence without prejudice to Plaintiff's filing petition for habeas corpus;

- dismissing claims for damages predicated on constitutional infirmities in Plaintiff's current sentence or imprisonment as not cognizable;

- dismissing claims against Lancaster County Prison and Lancaster County Court of Common Pleas, and

- dismissing claims against the Honorable Dennis E. Reinaker on absolute immunity grounds.

ECF 2 (Apr. 23, 2013 Order).

Giving effect to this Order, Plaintiff continued to maintain claims against certain prison employees for compensatory damages for violations of his constitutional rights as an untried state court detainee.  On June 19, 2013, all remaining Defendants filed a Motion to Dismiss. ECF 14 (Motion to Dismiss Plaintiff's Complaints), 15 (Mem. in Supp. of Mot. to Dismiss). Defendant responded in opposition to that Motion on August 22, 2013.[1]  ECF 17 (Opp'n to Mot. to Dismiss).

For the reasons that follow, Defendant's motion will be granted and Plaintiff's Complaint will be dismissed without prejudice and with leave to file an amended complaint.

## II. Allegations and Contentions

### A. Plaintiff's Allegations

Plaintiff sets forth allegations of violations of his constitutional rights in several Exhibits attached to his Complaint.  As alleged, the events forming the basis of Plaintiff's Complaint occurred during two time periods:  the first between February 13 and May 5, 2012, and the second on March 4, 2013.  Plaintiff's allegations and the supporting documents show that he participated in a pretrial conference, related to the criminal case where he is a defendant, on February 12, 2013.  Plaintiff's detention status during these time periods is unclear, but requires specificity for reasons set forth below.

Between February 13 and May 5, 2012, Plaintiff was housed in Housing Unit 3-2 at Lancaster County Prison.  During that time, Plaintiff alleges that he was housed in a 6 by 12 foot

---

[1] On the same day, Plaintiff also filed a Notification of Attorney Misconduct on the Part of Defendant's Counsel Lawrence J. Bartke.  ECF 18.  This Notification appears to be, in part, an explanation of why Plaintiff did not file his Opposition brief within the given amount of time. Plaintiff explains that he misunderstood the Proposed Order attached to the Motion to Dismiss to be an actual order from this Court.  The Court notes this misunderstanding, but does not find any misconduct by Mr. Bartke.

cell with two other inmates, resulting in one inmate being forced to sleep on the floor near the toilet.  Plaintiff also alleges that the cell lacked ventilation and, despite his verbal and written requests to open the window, the window remained closed at all times.  On May 5, 2012, between the hours of nine o'clock in the evening and six o'clock the next morning, Plaintiff alleges that the water in the prison shut down.  As a result, the toilet in the cell filled with human waste, causing a foul smell.  Plaintiff asserts that the situation prevented him from eating and washing himself, which caused him to feel stressed out and humiliated.  Plaintiff further alleges that, around 3 or 4 in the morning, he asked when the water would be restored and the officer responded that he did not know.

On March 4, 2013, less than a month after his pretrial conference, Plaintiff asserts that he lived in G-2 Housing Unit, known as the "Restricted Housing Unit/Hole."  Plaintiff alleges that Officer Bomtrigger reported to Sergeant Pena that numerous inmates in the unit had been late in locking down their cells.  As a result of this "minor infraction," Plaintiff alleges that certain inmates were "locked down" for 49 hours, without access to recreation, showers, or phone calls.  Plaintiff alleges that he raised the issue with Sergeant Wolfe who said that the officer should have given them a warning first.  Plaintiff asserts that he wrote to complain about the shutdown but never received a response.  Plaintiff additionally complains of overcrowding in this unit, which created a hazardous condition when a prisoner sleeping in the top bunk could not see where the inmate on the floor was sleeping.  Plaintiff also alleges that the prison forced them to eat in their cells, which, coupled with the overcrowding problem, caused him to eat either on the bed, the floor, or the toilet.

Finally, Plaintiff asserts that the prison's grievance system is inadequate. Plaintiff alleges that grievances are reviewed by the general prison staff or officers, who cannot act without bias. Plaintiff also asserts that:

> It is a know[n] fact and common practice that: 1. The officers on the housing unit have keys to open the mail and Request/Grievance Box; And if the officer feels He may have been written up He will wait until population has locked down and open Request Box and dispose of Request Forms.

Plaintiff also alleges that the prison stopped providing prisoners with grievance forms but instead told them to write their grievances on a "General Purpose Request Form." Finally, Plaintiff asserts that while he wrote numerous grievances, he had yet to receive a reply.

### B. Motion to Dismiss

Defendants' Motion to Dismiss argues that Plaintiff fails to allege a constitutional violation and, even if he had, that the Defendants are entitled to qualified immunity.

#### 1. Constitutional Violation

Defendants contend that Plaintiff's allegations fall short in several respects. Defendants first argue Plaintiff fails to make specific allegations or personal involvement or actual knowledge and acquiescence by any individual Defendant, as required by § 1983. Specifically regarding the water shutdown, Defendants point out that Plaintiff offers no allegations that any Defendant personally deprived him of water or purposefully withheld water from him. ECF 15 (Mem. in Supp. of Mot. to Dismiss) at IV.A.

Next, Defendants argue that Plaintiff's Eighth Amendment claims should be dismissed because he fails to allege deliberate indifference on the part of any Defendant. Id. at IV.B. They contend that Plaintiff has not alleged that any of the Defendants affirmatively acted or failed to act in a way that violated his constitutional rights. Rather, according to Defendants, Plaintiff merely points to a single isolated incident in the prison where the water in the prison was not

4

working for an unspecified reason.  Defendants contend that those allegations do not show a significant deprivation as a result of the water shutdown, nor, they argue, does Plaintiff allege that any Defendant caused the lack of water or acted with deliberate indifference by depriving him of water.

Defendants also argue that Plaintiff's allegations of lack of ventilation fall short of showing a constitutional violation because Plaintiff does not allege that he advised any of the Defendants of his request and, even if he did, a refusal to open a window does not constitute a deprivation of a basic human need or a life necessity as required by law.  Id.

Defendants also argue that Plaintiff fails to plead a violation of his Fourteenth Amendment rights because he fails to plead that the prison officials or any Defendant intended the deprivation of water as punishment.  In support, Defendants points out that Plaintiff does not allege that he was denied water for an excessive period of time or that it was caused by the action of, or purposefully by, anyone at the prison, including any Defendants.  Id. at IV.C.  Defendants also emphasize that Plaintiff did not have to endure the lack of water for an excessive period of time.

Defendants' arguments focus solely on Plaintiff's allegations regarding the water stoppage and the lack of ventilation.  They do not address the issue of overcrowding or Plaintiff's allegation that he was held in lockdown for 49 hours.

### 2. Qualified Immunity

Even if the Court finds a constitutional violation, Defendants argue that they are entitled to qualified immunity because they did not act unreasonably or in violation of a clearly established right.  Id. at IV.D.

### C. Opposition to Motion to Dismiss

In his short opposition brief to the Motion to Dismiss, Plaintiff focuses on the issue of overcrowding and water deprivation. He argues that this overcrowding is systematic and that the prison and its official know of the problems associated with it. ECF 17 (Opp'n to Mot. to Dismiss) at 2, 4. With respect to the water stoppage, Plaintiff argues that while a halt in running water for four or five hours may not itself constitute a violation, the fact that Defendants did not move him indicates that they intended to punish him. Id. at 4.

### III. Analysis

#### A. Legal Standards

##### 1. Section 1983

To state a valid claim under § 1983, a plaintiff must "allege the violation of a right secured by the Constitution and law of the United States, and must show that the alleged deprivation was committed by a person acting under the color of state law." West v. Atkins, 487 U.S. 42, 48, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988). "A defendant in a civil rights action must have personal involvement in the alleged wrongs . . . . Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988) (internal citations omitted).

In addition, a plaintiff must demonstrate a "close causal connection" between his injury and a defendant's conduct. Little v. Lycoming Cnty., 912 F. Supp. 809, 818 (M.D. Pa. 1996). "To establish the necessary causation, a plaintiff must demonstrate a[n] . . . affirmative link between the defendant's actions and the specific deprivation of constitutional rights at issue." Hedges v. Musco, 204 F.3d 109, 121 (3d Cir. 2000) (quotation marks omitted).

### 2. Constitutional Violation

#### a. Eighth Amendment Violation

The Third Circuit has made clear that "the Eighth Amendment's Cruel and Unusual Punishments Clause does not apply until 'after sentence and conviction.'" Hubbard v. Taylor, 399 F.3d 150, 165 (3d Cir. 2005) ("Hubbard I"). Thus, to the extent that Plaintiff was a pretrial detainee, he is "not within the ambit of the Eighth Amendment['s]," prohibition against cruel and unusual punishment. Id. at 166 (quoting Boring v. Kozakiewicz, 833 F.2d 468, 471 (3d Cir. 1987)). Because pre-trial detainees "are not yet at a stage of the criminal process where they have not been convicted of anything," they "cannot be punished at all under the Due Process Clause." Id.

But these due process rights ensure greater protection to a detainee. As the Supreme Court explained, "the due process rights of a [pre-trial detainee] are at least as great as the Eighth Amendment protections available to a convicted prisoner." Id. at 165-66 (quoting City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244, 103 S. Ct. 2979, 77 L. Ed. 2d 605 (1983)).

Thus, we consider only Plaintiff's due process claims under the Fourteenth Amendment.

#### b. Due Process Violation

The Supreme Court first discussed the application of the Due Process Clause to pre-trial detainees in Bell v. Wolfish, 441 U.S. 250, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979). There, federal pre-trial detainees claimed that a number of the conditions of their confinement violated various provisions of the Constitution.[2] The challenged conditions included the practice of

---

[2] The Fifth Amendment Due Process Clause was implicated in Bell because the plaintiffs were federal pre-trial detainees. Inasmuch as we are here concerned with state pre-trial detainees, any applicable constraints must arise from the Due Process Clause of the Fourteenth Amendment. See Fuentes v. Wagner, 206 F.3d 335, 344 (3d Cir. 2000). However, the Court's due process analysis under the Fifth Amendment in Bell nevertheless controls that inquiry. See, e.g., Union County Jail Inmates v. DiBuono, 713 F.2d 984, 991-92 (3d Cir. 1983).

confining two inmates in a cell intended and designed for one.  Hubbard v. Taylor, 399 F.3d 150, 158 (3d Cir. 2005).

> In resolving the issue, the Court stated:
>
> In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process, we think that the proper inquiry is whether those conditions amount to punishment prior to an adjudication of guilt in accordance with the law.

Id. at 535 (citations omitted).[3]  In order to determine whether the challenged conditions of pre-trial confinement amounts to punishment,

> [a] court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Absent a showing of an expressed intent to punish on the part of the detention facility officials, that determination generally will turn on whether [it has] an alternative purpose ... and whether it appears excessive in relation to [that] purpose.... Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal-if it is arbitrary or purposeless-a court may permissibly infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.

Id. at 538-39 (citations, brackets and internal quotations omitted).  The Court did not, however, "detail the precise extent of the legitimate governmental interests that may justify conditions or restrictions of pretrial detention[.]"  In Bell, the Court reasoned that it need only

> recognize that in addition to ensuring the detainees' presence at trial, the effective management of the detention facility once the individual is confined is a valid objective that may justify imposition of conditions and restrictions of pretrial confinement and dispel any inference that such restrictions are intended as punishment.

---

[3] The Court noted that the government "may . . . incarcerate a person charged with a crime but not yet convicted to ensure his presence at trial . . . Traditionally, this has meant a confinement in a facility which, no matter how modern or antiquated, results in restricting the movement of a detainee in a manner in which he would not be restricted if he simply were free to walk the streets pending trial."  Id. at 531, 537.  Nevertheless, there remains "a distinction between punitive measures that may not be constitutionally imposed prior to a determination of guilt and regulatory restraints that may."  Id. at 537 (citations omitted).

Id. at 540.  In determining whether conditions or restrictions are

> reasonably related to the Government's interest in maintaining security and order and operating the institution in a manageable fashion, courts must heed our warning that such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.

Id. at 540 n.23, 99 S. Ct. 1861 (citations and internal quotations omitted).

The Court held that double-bunking under the circumstances there did not constitute punishment and, accordingly, did not violate the pre-trial detainees' due process rights.  Id. at 541-43.  More precisely, the Court found no due process violation where pre-trial detainees who were detained for generally less than sixty days were housed in 75 square feet of space containing a double bunk for six to seven hours a day, primarily for sleeping purposes. However, the Court offered a significant caveat.  It cautioned that "confining a given number of people in a given amount of space in such a manner as to cause them to endure genuine privations and hardship over an extended period of time might raise serious questions under the Due Process Clause as to whether those conditions amounted to punishment."  Id. at 542.  It did not, however, elaborate upon the duration of confinement that could constitute "an extended period of time," nor did it elaborate upon the kind of "privations and hardship" that could constitute punishment in violation of the Due Process Clause.

The Third Circuit has since considered the issue, and set forth another two-step test wherein it first asks "whether any legitimate purposes are served by these conditions," and then, "whether these conditions are rationally related to these purposes."  Union Cnty. Jail Inmates v. Di Buono, 713 F.2d 984, 992 (3d Cir. 1983).  The Third Circuit continued:  "In assessing whether the conditions are reasonably related to the assigned purposes, we must, further, inquire as to whether these conditions 'cause [inmates] to endure [such] genuine privations and hardship

9

over an extended period of time," that the adverse conditions become excessive in relation to the purposes assigned for them.'" Id. (quoting Bell, 441 U.S. at 542).

To determine whether given conditions constitute "punishment," a court must therefore consider the totality of circumstances within an institution. Id. at 996; see also Hubbard I, 399 F.3d at 160; Jones v. Diamond, 636 F.2d 1364, 1368 (5th Cir.1981) ("In determining whether conditions of confinement are unconstitutional under ... the fourteenth amendment, we do not assay separately each of the institutional practices, but look to the totality of the conditions."), overruled in part on other grounds, Int'l Woodworkers of Am., AFL-CIO v. Champion Int'l Corp., 790 F.2d 1174 (5th Cir. 1986) (en banc).

### 3. Qualified Immunity

"Under certain circumstances, government officials are protected from ... § 1983 suits by qualified immunity." King v. Cnty. of Gloucester, 302 F. App'x 92, 98-99 (3d Cir. 2008); Couden v. Duffy, 446 F.3d 483, 492 (3d Cir. 2006). A qualified immunity analysis includes two steps. The threshold question asks whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). If Plaintiff has sufficiently alleged a constitutional violation, the court proceeds to the next step, which asks, "whether the right was clearly established."

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable police officer that his conduct was unlawful in the situation he confronted." Id. at 202. Thus, "[t]he qualified immunity standard 'gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.'" Gilles v. Davis, 427 F.3d 197, 203 (3d Cir. 2005) (quoting Hunter v. Bryant, 502 U.S. 224, 229, 112 S. Ct. 534, 116 L. Ed. 2d 589 (1991)).

### B. Application to Facts

With one exception, Plaintiff fails to allege that any specific involvement by any named Defendant.[4] This failure alone warrants dismissal without prejudice so that Plaintiff is given a chance to remedy this defect.

### 1. Overcrowding

Plaintiff complains of a practice known as "triple bunking," where a three people are placed in a cell designed for fewer people. See Hubbard I, 399 F.3d at 155 n.7. We must determine whether triple-bunking Plaintiff amounted to punishment or whether it was incidental to a legitimate government purpose. In Hubbard v. Taylor, 538 F.3d 229, 233 ("Hubbard II"), the Third Circuit recognized that "Defendants' practice of triple-bunking pretrial detainees was a response to the severe overcrowding" at the prison.[5] The Third Circuit went on to consider whether the triple-bunking was rationally related to this legitimate government interest and, looking to the totality of the circumstances, and concluded that "Plaintiffs were not subjected to genuine privations and hardship over an extended period of time for purposes of their due process claim." Id. at 235. But the Court emphasized the "factual sensitivity of the inquiry." Id. at 234. In reaching its decision, the Court focused on the availability of common areas and the amount of time inmates spent in those dayrooms as opposed to their cells. Id. at 233-234. The Court contrasted the circumstances before it with those in Lareau v. Manson, 651 F.2d 96, 104 (2d Cir. 1981), where the cells were much smaller and the dayrooms were so small and

---

[4] The one exception being his allegations regarding the March 4, 2013 lockdown. In his Complaint, Plaintiff writes that "Officer Bomtrigger reported to Sergeant Pena that numerous inmates in the unit had been late in locking down their cells" and that, as a result of that infraction, the inmates were ordered into a 49-hour lockdown period. Plaintiff, however, does not allege that either of those Defendants ordered the lockdown.

[5] The Third Circuit noted that the Supreme Court in Bell recognized that the government as "legitimate interests that stem from its need to manage the facility in which the individual is detained." Hubbard II at 233 (quoting Bell, 441 U.S. at 540).

overcrowded themselves that "the lack of living space in the doubled cells [was] compounded rather than alleviated by the situation in the common area." In that case, the Second Circuit found that the totality of conditions constituted unconstitutional punishment.

At the Motion to Dismiss stage, as we are here, a court cannot engage in the necessary factually intense inquiry that Hubbard II requires.

### 2. Lack of Water and Ventilation

The allegations of a lack of running water, on the other hand, do not arise to a constitutional violation. According to Plaintiff, the prison's water access was limited for only a few hours and all persons at the prison – including employees – experienced the results of the water stoppage. Plaintiff offers no allegations that any prison official intentionally deprived him of water or did so with the motivation to punish him.

Nor did the refusal of prison officials to open Plaintiff's cell window violate his constitutional rights. Judge Brody applied an Eighth Amendment analysis in Tapp v. Proto, 718 F. Supp. 2d 598, 620 (E.D. Pa. 2010), and found that an assertion "that the cell block … lacked proper ventilation and was unduly hot fail[ed] to rise to the level of a Constitutional violation." Id. at 620 (quoting Georges v. Ricci, No. 09-57(JAP), 2010 WL 606145, at *4 (D.N.J. 2010)) (alterations in original).

### 3. March 4, 2013 Lockdown

Plaintiff also alleges that the 49-hour period of lockdown imposed by the prison violated his constitutional rights. The Third Circuit considered a somewhat similar set of circumstances in Sutherland v. County of Hudson, 523 F. App'x 919 (3d Cir. 2013). The prisoner alleged that he was confined to a small cell with a cellmate for twenty-three hours per day, five days a week, and for thirty-two hours total over the remaining two days of the week. He also asserted that he received no prior misbehavior report, disciplinary infraction, or other documentation to justify

his assignment. There, the Court found that, because the District Court dismissed the claim prior to allowing Appellees to respond, it had no basis to conclude that the prisoner's placement was reasonable related to a legitimate objective.

Here, Defendants have had the opportunity to respond but did not address Plaintiff's allegations regarding this lockdown. Whether a 49-hour period of lockdown, which Plaintiff's allegations suggest was a departure from the normal detention conditions that was imposed due to a disciplinary infraction, would arise to the level of a constitutional violation, is unclear, and discovery may be necessary.

Plaintiff is a pro se litigant and, as such, his complaint must be held to "less stringent standards than formal pleadings drafted by lawyers." Haines v. Kerner, 404 U.S. 519, 520-21, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972). Thus, the Court will allow him to amend his Complaint to reassert his allegations with greater specificity.

**IV.   Conclusion**

The Defendants' Motion to Dismiss is granted without prejudice and Plaintiff will have 30 days to amend his Complaint to specify, at a minimum, the names of any individuals who intentionally acted adversely to Plaintiff and the details of his detention status during the time of his allegations, provided he can do so within the provisions of Rule 11 of the Federal Rules of Civil Procedure. If Plaintiff does not know specific names, he can designate Defendants as "John Doe #1" et seq., and seek further identification during discovery. An appropriate order follows.

O:\Caitlin\Civil\13-2018 (Garcia)\2014.1.9 MoL on MTD.docx